522 S.E.2d 626

**STATE of West Virginia, Plaintiff below, Appellee,**

v.

**Marc SCOTT, Defendant below, Appellant.**

No. 25442.

Supreme Court of Appeals of West Virginia.

Submitted March 23, 1999.

Decided July 8, 1999.

---

Darrell V. McGraw, Jr., Esq., Attorney
General, Barbara H. Allen, Esq., Leah Mar-

cia, Esq., Charleston, West Virginia, Attorneys for Appellee.

Franklin D. Cleckley, Esq., John R. Angotti, Esq., David J. Straface, Esq., Angotti & Straface, Morgantown, West Virginia, Attorneys for Appellant.

PER CURIAM:

This is an appeal from a June 8, 1998, final order of the Circuit Court of Monongalia County sentencing the appellant, Marc Scott ("Scott"), to a term of 25 years as a result of his jury conviction of second degree murder. Scott argues that the circuit court erred: (1) in allowing the medical examiner to state that the victim died by homicide; and (2) by admitting evidence in violation of *West Virginia Rules of Evidence* Rule 404(b). Scott also argues that the evidence presented below was insufficient to establish second degree murder.[1] Based upon our review of the record, the parties' arguments, and all matters submitted before this Court, we find that no error was committed by the court, and therefore, we affirm.

## I.

On the night of October 18, 1997, Scott drank alcohol beverages with his neighbor Clarence Cassidy ("Cassidy"). Scott returned home and continued to drink. The next morning Scott experienced a "hangover;" nevertheless, he decided to go squirrel hunting at approximately 7:00 a.m. Scott testified that he walked up a path behind the trailer in which he resided, up to a ridge. Scott further testified that he decided to return to his trailer when he could not find any squirrels.

According to Scott, as he was returning to his trailer he saw "glimpses of red," which Scott testified he believed to be a squirrel foraging for nuts. From approximately 50 yards away from what he believed to be a squirrel, Scott fired a .22 caliber weapon. Unfortunately, what Scott saw was not a squirrel. It was 16-year-old Brandon Ro-

senberger whom he shot in the head, and who died within moments of being shot.

Scott approached Rosenberger and checked his pulse, which quickly faded. Scott returned to his residence and hid his .22 caliber weapon under his trailer. Scott then returned to Cassidy's residence where he reportedly drank to intoxication.

Sometime later, two young boys discovered the body of Brandon Rosenberger and quickly informed one of the boys' father, LeRoy Wheeler. Mr. Wheeler, with his son, drove to the scene, and Mr. Wheeler checked Brandon Rosenberger for a pulse. He found none. While examining the victim, Mr. Wheeler heard two gunshots fired in his direction. The Wheelers quickly returned to their vehicle and reported the incident to the police.

Cassidy testified that he woke on the afternoon of October 19, 1997, to the sound of a gun being fired twice. After hearing the gunshots, Cassidy went to his porch where he found Scott standing, having just fired a 9mm handgun.

When the police arrived at the scene they found Brandon Rosenberger lying in the woods dead, with blood around his face, wearing jeans and a blue pullover.

The police then went to the Cassidy home where they were informed of the gunshots that Cassidy had heard, and were told that Scott had been there with a gun. The police next went to the home of Scott where they found Scott intoxicated. In Scott's trailer the police found a 9mm handgun behind the front door. They did not, at this time, find the .22 caliber weapon.

After being advised of his rights, Scott voluntarily went with a state trooper to the Morgantown state police detachment. While being transported, Scott denied firing a weapon that day. During an interview at the detachment, Scott changed his story and admitted that he fired shots from his 9mm handgun, but he denied owning a .22 caliber weapon. Scott also stated that he had heard

---

1. Scott also argues that the circuit court erred in permitting a jury view of the scene of the shooting during a time of year when the appearance of the scene was altered and by denying Scott's

motion to suppress several statements made by Scott during the course of the investigation. We find these assignments of error to be without merit.

gunshots and, after hearing the shots, he had investigated the area near his trailer and located the body of Brandon Rosenberger. Scott stated that he thought that Rosenberger was unconscious and left him alone.

On October 21, 1997, Scott changed his story, reporting to the police that he had owned a .22 caliber weapon, but had sold it 3 weeks prior to the shooting of Rosenberger. After Scott was informed that the police had evidence indicating that Scott had a .22 caliber weapon in his possession only 1 week prior to the death of Rosenberger, Scott again changed his story, admitting that he had the weapon before the shooting but had recently sold it.

Shortly thereafter, a search was conducted of the crime scene and the surrounding area. A .22 caliber weapon was located under Scott's trailer. On October 23, 1997, after the discovery of the weapon, Scott confessed to the shooting—now claiming it was a hunting accident.

Scott was subsequently charged with first degree murder and, following a trial by jury, was found guilty of second degree murder. This appeal followed.

## II.

### A.

*Testimony of the State's Medical Examiner*

 The first issue on appeal is whether the trial court properly allowed the state medical examiner, Dr. Frost, to testify that Rosenberger's "manner of death"[2] was a "homicide." Scott argues that by using the word "homicide," the testimony of Dr. Frost was an opinion on an ultimate issue at trial— whether the death of Brandon Rosenberger was due to an accident or due to murder.

Dr. Frost's testimony was not objected to during the course of the trial. However, Scott argues that although the testimony of Dr. Frost was not objected to, his testimony constitutes plain error that requires the conviction to be overturned.

 We have held that "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syllabus Point 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). We have further explained this doctrine and held that:

An unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

Syllabus Point 7, *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996).

In a plain error analysis, we first must determine whether the testimony of Dr. Frost, standing alone, would constitute error if admitted into evidence. Dr. Frost testified in relevant part, as follows:

Q. [by the State] Ultimately, Dr. Frost, what did you determine the cause of death to be?

A. Gunshot wound to the head.

Q. And is part of your determination in addition to cause of death, manner of death?

A. Yes, it is.

Q. Explain to the jury what the difference is between those two areas?

A. The cause of death is the injury or the disease process that causes someone's death. The manner of death is an opinion that deals with the circumstances under which death occurs. We have five manners of death; natural, accident, suicide, homicide and when you can't for all the investigation and all your determinations

---

**2.** The "manner of death" refers to how the death occurred and the circumstances surrounding the decedent's death.

conclude whether it's one of the previous four, you use the category of undetermined. Which in most, many medical examiner coroners' offices is perhaps one or two percent of all your cases.

Q. Now, you've said that the cause of death in your determination was the gunshot wound, is that correct?

A. Yes.

Q. Did you have an opinion as to the manner of death in this case?

A. Yes.

Q. What was that opinion as you expressed it in your report?

A. Manner of death is homicide.

. . .

Q. [by the defense] Now, by stating that the manner of death was homicide, that doesn't rule out some type of accidental shooting by a second person, does it?

A. The information I had didn't seem to indicate that this was accidental.

. . .

A. I don't make the differentiations between the varying degrees of manslaughter, voluntary, involuntary which is a legal matter when I have a wound that was fatal and fired from a distance and another person purposely pulled the trigger to fire that shot.

Q. Okay. And whenever you say you don't make the differentiation, that's a legal conclusion as to whether it would first degree manslaughter, involuntary manslaughter or something else?

3. In *State v. Clark, supra,* we stated:
 We agree that it was improper to permit the state medical examiner to testify conclusively that homicide was the manner of death. The appellant was charged with murder. In order for the jury to determine whether a murder had occurred, it first had to decide whether a homicide had taken place. Homicide means the killing of a human being by another human being for whatever reason justified or not. Once a jury determines that a homicide has occurred, it must then determine whether the killing was justified, and if not, the degree of culpability to be placed on the defendant.
 *Clark,* 171 W.Va. at 78, 297 S.E.2d at 852–853.

4. In *Smith, supra,* we stated:
 It is argued that the testimony of the medical examiner regarding the manner of death was

A. That's right. That's your realm, not mine.

Q. You're not able to sit here today and tell us which of those degrees would apply to the facts of this case, are you?

A. No, that is not my work. That is not my experience. That is not my training.

Scott contends that Dr. Frost's testimony was error in that it improperly invaded the province of the jury in that·the testimony was on the ultimate issue, and was not sufficiently probative so as to assist the trier of fact to understand the evidence and determine a fact at issue. Scott contends that Dr. Frost's testimony basically instructed the jury on what conclusion to reach. Scott relies on *State v. Clark,* 171 W.Va. 74, 297 S.E.2d 849 (1982), for the proposition that a state medical examiner may not testify that "homicide" was the manner of death in a case where the defendant's state of mind is at issue.[3]

We note that *Clark* was decided prior to our 1985 adoption of Rule 704 of the *West Virginia Rules of Evidence.* Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Additionally, this Court stated in *State v. Smith,* 178 W.Va. 104, 358 S.E.2d 188 (1987), that with the adoption of Rule 704, *Clark* would not be controlling on the issue of an expert's ability to testify that homicide was the manner of death.[4] Scott's reliance on *Clark* is, consequently, misplaced.[5]

impermissible under [*Clark*], insofar as it embraced an ultimate issue to be decided by the jury. However, in *Clark* we said that a medical examiner "may give his opinion as to the physical and medical cause of death." 171 W.Va. at 78, 297 S.E.2d at 853. We indicated he could not invade the province of the jury by giving the ultimate fact conclusion that it was a "homicide." Since *Clark,* we have adopted Rule 704 of the West Virginia Rules of Evidence . . .
178 W.Va. at 107 n. 1, 358 S.E.2d at 191 n. 1 (1987) (citations omitted).

5. Also, subsequent to the adoption of Rule 704 and *Clark,* the state medical examiner has testified that homicide was the cause and manner of a victim's death. *See State v. Garrett,* 195 W.Va. 630, 466 S.E.2d 481 (1995) and *State v. Triplett,* 187 W.Va. 760, 421 S.E.2d 511 (1992).

■ Nevertheless, Scott argues that the use of the term "homicide" by Dr. Frost was misleading to the jury and that his testimony stripped Scott of his defense that the shooting was an accident. Homicide is the "killing of one human being by the act, procurement, or omission of another." *Black's Law Dictionary* (6th ed.1990). Homicide is not, in and of itself, a crime.

> [Homicide] is a necessary ingredient of the crimes of murder and manslaughter, but there are other cases in which homicide may be committed without criminal intent and without criminal consequences.... The term "homicide" is neutral; while it describes the act, it pronounces no judgment on its moral or legal quality.

*Black's Law Dictionary* (6th ed.1990).

Because the term "homicide" is neutral and pronounces no judgment, we do not find that Dr. Frost testifying that Brandon Rosenberger's manner of death was homicide removed any defense available to Scott. In fact, Dr. Frost testified that his opinion was not a legal conclusion—that he was neither trained nor qualified to render a legal conclusion concerning Brandon Rosenberger's death.

We do not find in the instant case that the circuit court committed an error in permitting Dr. Frost to testify that Rosenberger's manner of death was homicide; therefore, we need not go further with the *Miller* analysis to determine the effect such testimony may have had in the trial.[6]

## B.

### Rule 404(b) Evidence

■ Scott next argues that the circuit court erred in permitting improper introduction of evidence under Rule 404(b) of the *West Virginia Rules of Evidence.* Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes,

such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Concerning the admissibility of 404(b) evidence, we have stated:

> When offering evidence under Rule 404(b) of the West Virginia Rules of Evidence, the prosecution is required to identify the specific purpose for which the evidence is being offered and the jury must be instructed to limit its consideration of the evidence to only that purpose. It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in Rule 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record and that purpose alone must be told to the jury in the trial court's instruction.

Syllabus Point 1, *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994).

■ Syllabus Point 2 of *McGinnis* states:

> Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an in camera hearing as stated in *State v. Dolin,* 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor,

---

**6.** We do not intimate that in some cases a defendant might be able to legitimately oppose permitting an expert to give an opinion that invades the province of the jury—including labeling a death a "homicide." This is not such a case.

the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

■ In order to convict the defendant of second degree murder,[7] the prosecution was required to prove malice.[8] Malice is not easy to define. It has been "frequently used, but not extensively defined, by this Court." *State v. Starkey*, 161 W.Va. 517, 524, 244 S.E.2d 219, 223 (1978), *overruled on other grounds, State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). In an attempt to define "malice" we stated:

> [T]he source of ... malice is not only confined to a particular ill will to the deceased, but is intended to denote ... an action flowing from a wicked and corrupt motive, a thing done *malo animo*, where

the fact has been attended with such circumstances as carry in them the plain indications of a heart regardless of social duty, and fatally bent on mischief. And therefore malice is implied from any deliberate cruel act[.]

*State v. Douglass*, 28 W.Va. 297, 299 (1886).

■ Whether malice exists in a particular case is a question for the jury to determine—"malice is a subjective condition of mind, discoverable only by words and conduct, and the significance of the words and conduct of an accused person, ... addresses itself peculiarly, to the consideration of the jury." Syllabus Point 4, *State v. Hamrick*, 112 W.Va. 157, 163 S.E. 868 (1932).

■ The prosecution sought introduction of the 404(b) evidence under the theory that Scott did not accidentally shoot Brandon Rosenberger in a hunting accident, as the defendant claimed, and to prove malice.[9] The prosecution sought to show that Scott had a history of threats and violent acts, in an attempt to keep people away from his property. The 404(b) evidence included testimony that Scott had brandished and fired weapons in several instances in a threatening manner.

The prosecution filed a motion to introduce the 404(b) evidence, and a hearing was conducted pursuant to *McGinnis, supra*.[10] The

---

**7.** *W.Va.Code*, 61–2–1 [1991] defines first and second degree murder as follows:

> Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnaping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance ... is a murder of the first degree. All other murder is murder of the second degree.

**8.** "This Court has always recognized that malice is an essential element to murder in the ... second degree." *State v. Starkey*, 161 W.Va. 517, 523, 244 S.E.2d 219, 223, (1978) (citations omitted).

**9.** To prove malice in the instant case, the prosecution relied upon the following 404(b) evidence: (1) Brian D., a child, testified that Scott had yelled at him, and had seen Scott holding a firearm on different occasions; (2) Christina D., a child, testified that she once had heard shots, after seeing Scott holding a handgun on his

porch; (3) Nick D., a child, testified that after Scott's dog mysteriously disappeared, Scott had threatened Nick and his friend, saying that if Scott found out they had "messed" with his dogs he would kill them; (4) Josh C., a child, testified that while riding past Scott's trailer, Josh felt something hit his back—and he believed that Scott had fired an air gun pellet at him; and (5) Fred Simmons, a neighbor, testified that Scott had mentioned he was going to shoot an acquaintance and, on another occasion, brandished a weapon while Scott made general threats toward those who "messed with him."

**10.** The State offered the following reasons during the *McGinnis* hearing to explain the relevance of the requested testimony under 404(b):

> [Scott] says it's an accident and that he did not intend, obviously, by saying that, did not intend to harm the victim or any person. We believe that by his pattern of making threats towards these youth that came through that area—and Brandon Rosenberger [the victim], you'll hear later on in this hearing was one of

trial court, after a *McGinnis* analysis, concluded that: (1) the defendant had committed the acts; (2) that the evidence was not unduly prejudicial; and (3) that there existed similarities between each incident and the state's theory of what occurred.[11] We held in Syllabus Point 1 of *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990) that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Furthermore, we review the admission of 404(b) evidence under an abuse of discretion standard and have stated that we review the introduction "in the light most favorable to the party offering the evidence, in this case the prosecution, maximizing its probative value and minimizing its prejudicial effect." *McGinnis*, 193 W.Va. at 159, 455 S.E.2d at 528.

We note that the trial court was very careful in its examination of the proffered 404(b) evidence, adhering to the requirements set forth in *McGinnis*. Scott does not argue that the trial court's factual determinations were incorrect, nor does he argue that the trial court failed to properly instruct the jury on the limited purpose for which the 404(b) evidence was admitted. Rather, Scott argues that the trial court erred in admitting the 404(b) evidence, when the evidence was prejudicial and not sufficiently probative.[12]

■ Rule 403 of the *West Virginia Rules of Evidence* provides "that although relevant,

evidence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence." *State v. Derr*, 192 W.Va. 165, 178, 451 S.E.2d 731, 744 (1994) (citations omitted). However, we have also stated that Rule 404(b) is an " 'inclusive rule' in which all relevant evidence involving other crimes or acts is admitted at trial unless the sole purpose for the admission is to show criminal disposition." *State v. Edward Charles L.*, 183 W.Va. 641, 647, 398 S.E.2d 123, 129 (1990) (citations omitted).

The record indicates that the trial court observed all of the requirements of *McGinnis*. After determining that the acts or conduct occurred, and that Scott committed the acts, the trial court determined that the evidence was relevant and probative.[13] We find that the prosecution was not seeking to admit the 404(b) evidence to show a criminal disposition, but to provide evidence indicating that the shooting was not the shooting accident Scott claimed. Consequently, we find that Scott's argument that the trial court abused its discretion is without merit.

### C.

### *Sufficiency of the Evidence*

■ Finally, Scott argues that the verdict was against the weight of the evidence and, therefore, the conviction should be overturned. Scott argues that the State failed to prove beyond a reasonable doubt that "malice" existed—an element required to be found before a jury can return a verdict of guilty for second degree murder. Scott contends that there was no evidence that he had ever met Brandon Rosenberger before the

---

the individuals who was a recipient of threats and knew about the threats toward others, and all of these kids who we are talking about here today who were aware of how the defendant behaved toward them and was protective of his property and not wanting these youth up there.

**11.** The trial court did not permit all 404(b) evidence to be introduced at trial. The testimony of another child, Jeremy C., was rejected after the trial court determined that the testimony did not meet the requirements of *McGinnis*.

**12.** *W.Va. R. Evid.* Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.

**13.** In its order of April 27, 1998 the trial court stated that "the evidence is not unduly prejudicial and finds that there exist significant similarities between each incident and the State's theory of what occurred in this case and that the incidents are not too remote in time to be relevant."

day of the shooting nor was there any evidence admitted tending to show that Scott acted with malice when he shot Brandon Rosenberger. Scott asserts that there was only one eyewitness to the fatal shooting, Scott himself, and he testified that the shooting was accidental.

 We have established the following standards for reviewing a· sufficiency of the evidence challenge:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syllabus Points 1 and 3, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995).

We have stated that a defendant faces an "uphill climb" when he challenges the sufficiency of the evidence and that we will reverse "only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. LaRock,* 196 W.Va. 294, 303, 470 S.E.2d 613, 622 (1996).

The record in this matter indicates that Scott killed Brandon Rosenberger with a .22 caliber weapon from a distance of approximately 50 to 60 yards while Brandon was walking down a path. Scott argued that he was hunting. However, evidence was introduced that the shooting took place on a Sunday—when it was illegal to hunt—and in an area where it was illegal to hunt. Evidence was also introduced demonstrating that Scott had not hunted for a period of 1 to 2 years prior to the shooting, and did not have a hunting license.

In addition to this evidence, the jury also heard from neighbors and children who testified that Scott had a history of brandishing firearms in an attempt to intimidate people and keep individuals away from his property. Finally, the jury also heard testimony suggesting that not only did Scott leave Brandon Rosenberger after shooting him, but when Mr. Wheeler came to investigate the matter, Scott shot at him as well.

Taken in a light most favorable to the prosecutor, we believe that the evidence was sufficient to convince a reasonable person of Scott's malice in his actions toward Brandon Rosenberger. Consequently, we find that Scott's claim that the evidence was insufficient to support a guilty verdict for second degree murder is without merit.

### III.

In conclusion, we find that the trial court committed no error in regard to Scott's conviction and we therefore affirm the trial court.

Affirmed.

STARCHER, Chief Justice, dissenting.

While I have no illusions as to what likely occurred in the Monongalia County woods on October 19, 1997, I respectfully dissent to register my protest on the direction our

Court continues to take with respect to what we now regularly refer to as "Rule 404(b) evidence." I fear that Rule 404(b) has become a runaway train in criminal cases.

The niceties of a *McGinnis*[1] analysis do little to remove the overwhelming prejudicial effect that is heaped upon a defendant in a criminal case, once a jury learns of the defendant's previous bad acts. Despite the limited reasons for which the evidence is purportedly offered, and despite cautionary instructions given to the jury—both when the evidence is adduced and in the court's general charge—the result is the same: all doubts are resolved against the defendant, because he is a proven bad actor.

I would hope that we could limit the trial of criminal cases—where there is the prospect of losing one's freedom—to the facts that are known about the incident on trial, rather than regularly relying on other incidents of bad conduct to bolster and help insure successful prosecutions.

Tossing aside the safeguards of our Constitution to promote and insure convictions is a much greater threat to democracy than risking an occasional offender not being convicted. In this case, the defendant would just as likely have been convicted of the charged offense without all of the Rule 404(b) evidence enumerated in Footnote 9 of the majority opinion.

Trial by innuendo and inference is not the American way.[2]

---

1. *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

2. It is worth noting that criminal trials from time to time convict innocent people. For example, in Illinois, since that state reinstated the death penalty, 12 people have been released from death row because they were exonerated. DNA evidence has exonerated several convicted people in West Virginia. One major factor that can help convict innocent people—that is tilt the balance in a close case—is so-called "404(b)" evidence.