674 S.E.2d 602

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Gloria Jean WILLETT, Defendant Below, Appellant.**

**No. 33835.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 13, 2009.

Decided Jan. 30, 2009.

Concurring Opinion of Justice Ketchum March 19, 2009.

Paul S. Detch, Lewisburg, for the Appellant.

Tom Truman, Assistant Prosecuting Attorney, Beckley, for Appellee.

PER CURIAM.[1]

Gloria Jean Willett, defendant below and appellant herein (hereinafter referred to as "Mrs. Willett"), appeals from an order of the Circuit Court of Raleigh County denying her motion for a new trial. Mrs. Willett was sentenced to prison after being convicted by a jury on four counts of drug possession with intent to deliver. She was also convicted of one count of conspiracy to commit a felony.[2] In this Court. Mrs. Willett assigns error to the trial court's ruling that permitted the jury to hear evidence of collateral crimes under Rule 404(b) of the West Virginia Rules

---

1. Pursuant to an administrative order entered on January 1, 2009, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing September 12, 2008, and continuing until the Chief Justice determines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

2. The circuit court sentenced Mrs. Willett to one to fifteen years imprisonment on one count of drug possession with intent to deliver. Sentences were imposed for the remaining counts but were suspended. Mrs. Willett is now out of prison and on parole.

of Evidence.[3] After a careful review of the briefs and the record submitted on appeal, and having listened to the oral arguments of the parties, we affirm.

## I.

## FACTUAL AND PROCEDURAL HISTORY

In 2001 or 2002, Mrs. Willett and her husband, Richard Willett, purchased a modest house in Beckley, West Virginia.[4] At the time of the purchase, the couple resided in Tampa, Florida. The house purchased in Beckley was in poor condition and required a lot of structural work. Consequently, for several years after the house was purchased, the Willetts continued to reside in Tampa. However, the couple frequently drove to Beckley to have work done on the house.

At some point in 2004, the Beckley City Police Department received a telephone call from an inmate at the Southern Regional Jail. The inmate, Alan Reed, informed the police that drugs were being sold from the house purchased by the Willetts. Subsequent to this call, in August of 2004, a Beckley police detective received additional information from another source that indicated a white female was coming from the Tampa, Florida, area to a house at 201 Quarry Street, the Willetts' home, and she would bring large amounts of Oxycontin to the home, possibly to sell. On a third occasion in 2004, the Beckley police received an anonymous call regarding drug activity at the Willetts' home:

> The caller went into detail that they had personally observed cars coming to the house, but parking away from the house as not to draw attention to themselves, going to the house for four or five minutes and then leaving, and they—in their opinion, they thought that some drug activity was going on.

In May 2005, the Beckley police received a fourth anonymous tip about drug activity at the Willetts' home. The anonymous informer named Mrs. Willett as the person selling drugs from the home.

On May 13, 2005, the Beckley police executed a search warrant for the Willetts' home. During the search, the police discovered over 3,000 pills, a handgun, and over $1,000 in cash. The pills included the narcotic drugs Oxycontin, Percocet, Roxycodone, and Xanax. Subsequent to the search, the police arrested Mrs. Willett.[5]

Mrs. Willett was indicted by a grand jury on four counts of drug possession with intent to deliver, and one count of conspiracy to commit a felony. In 2006, the case went to trial. During the trial, the prosecutor called five witnesses. Four of the witnesses were law enforcement officials who testified regarding evidence obtained during the search. They also provided testimony about information obtained during the investigation of the case. The fifth witness, Alan Reed, was the only witness to provide direct testimony of having purchased drugs from Mrs. Willett.[6] Mr. Reed testified that he was a drug addict and that during the period 2003 to 2005, he visited Mrs. Willett's home "about 50 to 100 times" to obtain narcotic pills from Mrs. Willett. Mr. Reed also testified that he brought other individuals to Mrs. Willett for the purpose of buying narcotic drugs. On those occasions, Mrs. Willett would give him drugs as a gratuity for bringing customers to her. There was further testimony by Mr. Reed that, on a few occasions, Mr. Willett was present when he obtained drugs from Mrs. Willett.

During Mrs. Willett's case-in-chief, she called her husband and adult daughter to testify on her behalf. Mr. Willett testified that his wife did not sell drugs. Their daughter testified that Mrs. Willett had a

---

3. Mrs. Willett's petition for appeal also assigned a second ground for appeal. However, this Court limited the appeal to the collateral crimes issue.

4. Mrs. Willett had family members living in the Beckley area.

5. The police also arrested Mr. Willett. However, charges against him were eventually dropped.

6. Prior to trial, Mrs. Willett filed a motion to preclude testimony by Mr. Reed. The trial court, after a hearing, denied the motion and allowed the testimony under W. Va. Rules of Evidence 404(b).

habit of hoarding all types of drugs for her personal use. Mrs. Willett took the stand. She testified that the narcotic drugs were legally obtained from prescriptions written by a Florida physician and a West Virginia physician.[7] Mrs. Willett admitted that neither doctor knew the other was prescribing the same narcotic drugs for her. She further testified that she needed the drugs to relieve pain from a back operation that she had in 2000. Mrs. Willett further stated that because she feared having problems obtaining the drugs, she began hoarding them.

At the conclusion of all the evidence, the jury returned a verdict convicting Mrs. Willett on each count of the indictment. The trial court subsequently imposed a sentence of imprisonment on one count that was to be served, but suspended the sentences imposed on the remaining counts. After the trial court denied Mrs. Willett's post-trial motion for a new trial, she filed this appeal.

## II.

### STANDARD OF REVIEW

 This case requires the Court to determine whether the circuit court properly admitted Mr. Reed's testimony pursuant to Rule 404(b) of the W. Va. Rules of Evidence. In discussing the standard of review to be applied to Rule 404(b) issues, this Court has stated:

> The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is

sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

*State v. LaRock,* 196 W.Va. 294, 310–11, 470 S.E.2d 613, 629–30 (1996). In *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994), we explained that this Court will "review the trial court's decision to admit evidence pursuant to Rule 404(b) under an abuse of discretion standard." *McGinnis,* 193 W.Va. at 159, 455 S.E.2d at 528. *McGinnis* further held:

> Our function on ... appeal is limited to the inquiry as to whether the trial court acted in a way that was so arbitrary and irrational that it can be said to have abused its discretion. In reviewing the admission of Rule 404(b) evidence, we review it in the light most favorable to the party offering the evidence, in this case the prosecution, maximizing its probative value and minimizing its prejudicial effect.

*McGinnis,* 193 W.Va. at 159, 455 S.E.2d at 528. Guided by these standards, we now consider the substantive issues herein raised.

## III.

### DISCUSSION

The sole issue presented for resolution is whether the circuit court properly admitted testimony presented by Mr. Reed under Rule 404(b).[8] As previously discussed, Mr. Reed's

---

**7.** The drug Roxycodone was actually prescribed for Mr. Willett.

**8.** "Rule 404(b) only applies to limit the admissibility of evidence of extrinsic acts. Intrinsic evidence, on the other hand, is generally admissible so that the jury may evaluate all the circumstances under which the defendant acted." *United ed States v. Sumlin,* 489 F.3d 683, 689 (5th Cir.2007) (internal quotations and citation omitted). *See State v. LaRock,* 196 W.Va. 294, 312 n. 29, 470 S.E.2d 613, 631 n. 29 (1996) ("In determining whether the admissibility of evidence of other bad acts is governed by Rule 404(b), we first must determine if the evidence is intrinsic or extrinsic. Other act evidence is intrinsic when the evidence of the other act and the evidence of

the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged. If the proffer fits in to the intrinsic category, evidence of other crimes should not be suppressed when those facts come in as *res gestae*—as part and parcel of the proof charged in the indictment.") (internal quotations and citation omitted). Insofar as the parties and trial court treated Mr. Reed's testimony as being governed by Rule 404(b), we limit our analysis of the admissibility of Mr. Reed's testimony to that rule. Further, it has been correctly noted that "the use of the evidence by the jury under a 404(b) theory or an 'inextricably intertwined' theory is not materially different." *United States v. McLean,* 138 F.3d 1398, 1404 (11th Cir.1998).

testimony involved prior criminal drug sales by Mrs. Willett. Insofar as Mrs. Willett was charged with possession of drugs with intent to deliver, Mr. Reed's testimony involved "other crimes" by Mrs. Willett. Rule 404(b) states, in part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith." However, Rule 404(b) provides an exception to its general prohibition against the introduction of "other crimes" evidence. Under this exception, "other crimes" evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial ... of the general nature of any such evidence it intends to introduce at trial[.]" Rule 404(b).

▮▮▮ In syllabus point 2 of *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), this Court established the procedure for trial courts to follow in ruling upon the admissibility of Rule 404(b) evidence:

Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evi-

dence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

The prosecution filed notice of its intention to introduce Rule 404(b) evidence through Mr. Reed at the trial.[9] In its notice, the prosecution declared the purpose for which the evidence was to be offered was that of motive, planning, and intent. Mrs. Willett filed a motion to exclude the testimony of Mr. Reed. The trial court then conducted an evidentiary hearing with respect to the prosecutor's notice and Mrs. Willett's motion. During the hearing, the trial court heard testimony from Mr. Reed, Mrs. Willett, and Mr. Willett. Ultimately, the trial court found that the prosecutor satisfied the requirements for admitting Mr. Reed's testimony under Rule 404(b).[10]

Mrs. Willett's brief appears to challenge the trial court's Rule 404(b) ruling on the basis that the evidence was insufficient to establish that Mr. Reed's testimony was reliable. She also asserts that the probative value of the evidence was outweighed by its prejudicial effect.[11] We address those two matters separately.

---

9. The notice also named another witness, Gary Lilly, but that witness was not called at trial.

10. After the hearing, the trial court took the issue under advisement. No formal ruling was made on the issue. The trial court's office informally notified the prosecutor that Mr. Reed would be allowed to testify. We caution trial judges that, when making Rule 404(b) determinations, the record should expressly reflect the reasoning employed by the court in reaching its ruling. In the instant case, the trial court's failure to state its

reasoning on the record does not require reversal. *See State ex rel. Caton v. Sanders*, 215 W.Va. 755, 762 n. 6, 601 S.E.2d 75, 82 n. 6 (2004) ("We note that a failure to expressly articulate how 404(b) evidence is probative does not mandate *automatic* reversal. If the basis for the admission of the evidence is otherwise clear from the record, we can affirm the circuit court.").

11. Mrs. Willett's brief is, at best, inartfully drafted. The brief is divided into terse sections that appear to raise issues. However, it falls short of

As to the reliability issue, Mrs. Willett argues that Mr. Reed was unable to provide any specific date on which the drug transactions occurred, and there was no evidence to corroborate his testimony. We reject these arguments as a basis for reversal. The record is clear. The prosecutor established by a preponderance of the evidence that the acts occurred and that Mrs. Willett took part in them.

At the suppression hearing, Mr. Reed testified that he was involved in 50 to 100 drug transactions with Mrs. Willett over a two-year period. Mr. Reed testified that he was introduced to Mrs. Willett by her brother, Gary Lilly. Mr. Reed stated that he went to see Mr. Lilly to buy drugs. Mr. Lilly had no drugs. However, Mr. Lilly informed Mr. Reed that he could buy drugs from his sister, Mrs. Willett. The following testimony was given by Mr. Reed during direct and cross examination at the hearing:

Q. How did you find out Mrs. Willett had pills to sell?

A. Her brother introduced me to her.

Q. What's her brother's name?

A. Gary Lilly.

. . . . .

Q. And I take it that Gary would be a person who would be available to confirm or deny that particular statement?

A. Yeah.

Q. Now—and where did that particular transaction take place?

A. I went down to Gary's and Gary said he didn't have any, so we went to his sister's house.

Q. And both of you went?

A. Yes.

Q. And that would have been, to your best recollection, two years ago?

A. Yes.

The prosecutor had intended to have Mr. Lilly testify at the hearing, but he was not available. Mrs. Willett acknowledged at the hearing that Mr. Lilly was in Florida. More importantly, Mrs. Willett's testimony revealed that Mr. Lilly gave a statement to the police that corroborated Mr. Reed's testimony. Mrs. Willett stated that she had read the statement by Mr. Lilly. Mrs. Willett asserted that the statement was not true. According to Mrs. Willett, Mr. Lilly made up the accusations because he thought that she was going to inform the police that he had previously broken into her home. However, at no time did Mrs. Willett inform the police about the alleged break-in. After extensive questioning about the matter, Mrs. Willett testified as follows:

Q. I guess I'm wondering if nothing happened to your brother at that—as a result of the break-in and that was in November of '04, why did he give a police statement in May of '05?

A. Because I had quit talking to him because of this incident of him breaking into my house, and I had told him I was going to call the police.

There was further testimony by Mr. Reed. He testified that, on at least two occasions, he cut Mrs. Willett's lawn, and she paid him with drugs. Mrs. Willett acknowledged that Mr. Reed had cut her lawn. She stated, however, that she had paid him cash for his services. Mr. Reed also testified that, while he was incarcerated, he called the police to inform them that Mrs. Willett was a drug dealer in order to make a deal to get out of jail. The record reflects that the prosecutor refused to offer any deal to Mr. Reed.

When looking at the evidence in its totality, we are satisfied that the trial court properly admitted Mr. Reed's testimony under Rule 404(b). Even though Mr. Reed was unable to give any specific dates regarding his drug transactions with Mrs. Willett, that matter is tempered by the fact that there was testimony by Mrs. Willett that her brother gave the police a statement that corroborated Mr. Reed's accusations against her.[12] Consequently, we find no clear error

---

presenting legally sufficient arguments. *See State v. LaRock,* 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are ... mentioned only in passing but are not supported with pertinent authority ... are not considered[.]" (citation omitted)).

12. We should note that Professor Cleckley has correctly observed that Rule 404(b) evidence may be admitted without corroboration:

in the trial court's determination that there was sufficient evidence to show that the other bad acts actually transpired. We further find that the trial court properly deemed the evidence admissible for a legitimate purpose under the Rule 404(b) analysis. It was used to demonstrate Mrs. Willett's motive, planning, and intent.

■ Likewise, we find the circuit court properly concluded that the prejudicial effect of Mr. Reed's testimony did not outweigh the probative value of that evidence. This Court has previously stated that "[m]ost, if not all, [evidence] which one party to an action offers in evidence [is] calculated to be prejudicial to the opposing party; therefore, it is only 'unfair prejudice' with which ... [Rule 404(b) is] concerned." *State v. McIntosh*, 207 W.Va. 561, 573, 534 S.E.2d 757, 769 (2000) (internal quotations and citations omitted). We have also made clear that "[u]nfair prejudice does not mean damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis." *LaRock*, 196 W.Va. at 312, 470 S.E.2d at 631. Applying this standard, the trial court reasonably could have concluded that Mr. Reed's testimony was probative of a fact and was not unduly prejudicial.

Mr. Reed's testimony about the uncharged drug transactions was integrally connected to the criminal activity charged in the indictment. Evidence of the prior drug sales was necessary to place Mrs. Willett's possession of such a large amount of narcotic prescription pills in context and to complete the story of the charged crimes. Mr. Reed's "testimony was so highly probative that any possible prejudice evaporated in comparison to it. Discerning no error, we hold the trial court acted within the realm of discretion in permitting the jury to hear and consider the contested testimony." *LaRock*, 196 W.Va. at 313, 470 S.E.2d at 632.

[F]or Rule 404(b) evidence to be admissible it must be reliable. Reliability is not synonymous with "credibility" and testimony is therefore not unreliable simply because it is in conflict or contradicted by other testimony. Thus, this evidence can be admitted even though it is not corroborated.

## IV.

## CONCLUSION

The circuit court's order denying Mrs. Willett's motion for a new trial is affirmed.

Affirmed.

Justice KETCHUM concurs and reserves the right to file a concurring opinion.

Justice ALBRIGHT not participating.

Senior Status Justice McHUGH sitting by temporary assignment.

KETCHUM, J., concurring:

(Filed March 19, 2009)

I concur with the majority's opinion. Reading the record in the light most favorable to the prosecution, the trial judge did not abuse his discretion in allowing the jury to hear evidence of the defendant's uncharged "bad acts" admitted under Rule 404(b) of the *West Virginia Rules of Evidence.*

I feel compelled to write separately because I believe that the use of "bad acts" evidence under Rule 404(b) in criminal trials is now routinely used to convince the jury that they should convict the defendant because he or she is not a nice person.

### A.

### *Modification of Rule 404(b) is Needed to Protect the Innocent*

We all know the axiom that "[i]n the trial of a criminal offense, the presumption of innocence existing in favor of a defendant continues through every stage of the trial until a finding of guilty by the jury." Syllabus Point 11, *State v. Pietranton*, 140 W.Va. 444, 84 S.E.2d 774 (1954). But the real world truth is that, when a jury hears evi-

1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 4–5(B)(3)(c) (4th ed.2000). *See State v. Zacks*, 204 W.Va. 504, 509, 513 S.E.2d 911, 916 (1998) (" 'Courts have held that corroboration of 404(b) evidence of other crimes is not required.' ") (quoting *United States v. Bailey*, 990 F.2d 119, 123 (4th Cir. 1993)).

dence that a defendant has committed some bad acts beyond those in the indictment, the jury dispenses with any notions that the defendant is innocent and reviews the evidence from the perspective that the defendant is a "bad person." It is undeniable that a jury will be more inclined to convict once they hear that a defendant may have engaged in other "bad acts"—even if the defendant was never charged or convicted for that other conduct. "The niceties of a *McGinnis* analysis do little to remove the overwhelming prejudicial effect that is heaped upon a defendant in a criminal case, once a jury learns of the defendant's previous bad acts." *State v. Scott,* 206 W.Va. 158, 168, 522 S.E.2d 626, 636 (1999) (Starcher, C.J., dissenting) (citing *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994)).

Rule 404(b) was originally designed to keep such fundamentally unfair evidence of uncharged misconduct away from the jury, allowing the jury to focus on the proper question: does the evidence show the defendant committed the crime with which he or she is currently charged? However, since I took the bench two months ago, "bad acts" evidence has been raised as an error in virtually every criminal appeal presented to our Court. It is obvious that prosecutors are using "bad acts" evidence to prejudice defendants and to divert jurors' attention from the evidence surrounding the charged crime. This abusive use of uncharged "bad acts" evidence by prosecutors will, in the future, lead to the conviction of an innocent person. Of this, I am convinced. I therefore propose a change to Rule 404(b) in criminal cases.

## B.

### *The Correct Rule: State v. Miller (1915)*

As early as 1872, this Court said that evidence of misconduct other than that for which a defendant was being tried could not be used at a trial. We held in Syllabus Point 1 of *Watts v. State,* 5 W.Va. 532 (1872):

> Evidence of a distinct, substantive offense cannot be admitted in support of another offense.

This absolute prohibition later softened slightly, and the Court permitted such evidence to be used in rebuttal—but only if the defendant first attempted to show he did not commit the crime because he was a person of good character. As we said in Syllabus Point 2 of *State v. Miller,* 75 W.Va. 591, 84 S.E. 383 (1915):

> It is error to admit evidence, in such a case, tending to prove bad character or degradation on the part of the accused, over his objection and in the absence of evidence adduced by him to establish good character on his part.

*See also,* Syllabus Point 1, *State v. Graham,* 119 W.Va. 85, 191 S.E. 884 (1937) ("In a criminal trial, the state cannot introduce evidence, not connected with the crime for which the accused is being tried, for the purpose of showing his bad character, until the accused has first put his own character in issue by attempting to prove a previous good character.")

## C.

### *The Shift Away from the Correct Rule*

When I first started practicing law in 1967, prosecutors rarely if ever tried to convict a defendant using evidence of "uncharged misconduct" and "other bad acts." Courts were exceptionally restrictive, and rarely allowed the use of collateral crimes to be admitted. The defendant was tried for the crime charged in the warrant or the indictment. The common-law rule of evidence on "other bad acts" in West Virginia was a clear rule of exclusion: the evidence could not be admitted, except for a few narrow exceptions.

It was axiomatic that when a person was placed on trial for the commission of a particular crime, if the person was going to be convicted, then the person was going to be convicted based upon evidence showing the person's guilt of the specific offense charged in the indictment. Nothing more, nothing less.

The reason that West Virginia—and, for that matter, most other jurisdictions—opted to generally exclude evidence of other collateral bad acts was stated this way in 1961:

> Evidence of the accused's past criminal history—prior convictions at trial, pleas of guilty, acquittals for technical reasons, ar-

rests, and police or private suspicions—have traditionally been viewed with distrust in Anglo–American law. Probably the principal reason for limiting the use of "other crimes" evidence at trial has been the fear that such evidence will prejudice the jury against the accused. The notion of prejudice encompasses two distinct tendencies of jurors. The first is the tendency to convict a man of the crime charged, not because he is guilty of that offense, but because evidence introduced indicates that he had committed another unpunished crime or that he is a "bad man" who should be incarcerated regardless of his present guilt. A conviction for this reason would violate the principle that a man may be punished only for those acts with which he has been charged. The second is the tendency to infer that because the accused committed one crime, he committed the crime charged. In many instances this inference rests on no greater foundation than the belief that commission of one crime indicates a propensity to commit others. Convictions based on this equation are disapproved because of the limited probity of propensity evidence. Whatever statistical data may demonstrate about the likelihood of repeated crimes in a given group of offenders, it says little about the guilt of an individual defendant. Recognizing both these jury tendencies, American courts have generally excluded other crimes evidence which proves no more than "criminal disposition" or "criminal character," reasoning that the possibility of inflaming jury sentiments outweighs the limited relevance of such evidence.

Note, 70 Yale L.J. 763–64 (April, 1961). *See also, McKinney v. Rees*, 993 F.2d 1378, 1380 (9th Cir.1993) (*quoting Harrison's Trial*, 12 How.St.Tr. 834 (Old Bailey 1692)) ("Hold, what are you doing now? Are you going to arraign his whole life? Away, away, that ought not to be; that is nothing to the matter.").

My recollection of the rare use of bad acts evidence in criminal cases is supported by Syllabus Point 11 of *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974), where the Court said:

> Subject to exceptions, it is a well-established common-law rule that in a criminal prosecution, proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times, even though they are of the same nature as the one charged, is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged, unless such other offenses are an element of or are legally connected with the offense for which the accused is on trial.

The Court in *Thomas* went on, in Syllabus Point 12, to list the five exceptional cases where "other bad acts" evidence could be admitted:

> The exceptions permitting evidence of collateral crimes and charges to be admissible against an accused are recognized as follows: the evidence is admissible if it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the crime on trial.

The *Thomas* Court expressed the obvious concern that prosecutors might still try a defendant for one crime by using evidence that the defendant committed other crimes, and raise the inference with the jury that because the defendant had previously committed other crimes, then the defendant was more liable to have committed the crime for which he or she is presently indicted and being tried.[1]

---

1. One commentator, in a treatise on uncharged misconduct, gave the following summary of research on the effect of bad acts evidence in criminal cases:

> ... Studies by the London School of Economics (LSE) indicate that the admission of a defendant's uncharged misconduct significantly increases the likelihood of a jury finding of liability or guilt. The Chicago Jury Project reached the same conclusion. The Chicago researchers concluded that as a practical matter, the presumption of innocence operates only for defendants without prior criminal records. Evidence of uncharged misconduct

But an even greater concern expressed by the *Thomas* Court was not with "the arguable admissibility of the evidence of collateral crimes and charges under one of the recognized exceptions, but rather, whether the prosecutor prejudiced the accused by the excessive employment or 'shotgunning' of such evidence against the accused." *Thomas*, 157 W.Va. 640, 656, 203 S.E.2d 445, 456. The Court was concerned that prosecutors would poison a jury's attitude toward a defendant through nothing more than piling on massive and wide-ranging volumes of "other bad acts" evidence. The mere quantity of this evidence would also prejudice a defendant by confusing the defendant's ability to present a defense to the indictment by compelling the defendant to defend against unrelated, uncharged offenses.[2]

The Court therefore gave the following admonition to circuit courts in criminal cases:

> In the exercise of discretion to admit or exclude evidence of collateral crimes and charges, the overriding considerations for the trial court are to scrupulously protect the accused in his right to a fair trial while adequately preserving the right of the State to prove evidence which is relevant and legally connected with the charge for which the accused is being tried.

Syllabus Point 16, *Thomas, supra.*[3]

## D.

### *The Academics Take Over*

In 1975, Congress adopted the *Federal Rules of Evidence.* "The philosophy of the Federal Rules, and it qualifies as revolutionary, is that any relevant evidence, by which it is meant anything that gives promise of being helpful to the trier of facts, is admissible if it is not rendered incompetent, for policy-based reasons, by a dwindling number of exclusionary rules[.]" Jon R. Waltz, "Judicial Discretion in the Admission of Evidence Under the Federal Rules of Evidence," 79 N.W.U.L.Rev. 1097, 1120 (1984).

Rule 404(b) of the *Federal Rules of Evidence* codified the "uncharged misconduct" doctrine in two sentences, but it shifted the doctrine from being exclusionary to being inclusionary. That is to say, under Rule 404(b), it became easier to admit evidence of

---

strips the defendant of the presumption of innocence. If the judge admits a defendant's uncharged misconduct and the jury thereby learns of the record, the jury will probably use a "different ... calculus of probabilities" in deciding whether to convict. The uncharged misconduct stigmatizes the defendant and predisposes the jury to find him liable or guilty.

The National Science Foundation Law and Social Science Program sponsored research into the prejudicial impact of various types of evidence. That research confirms the conclusions reached earlier by the LSE and University of Chicago studies. The researchers discovered that laypersons often differ from attorneys in their estimation of the prejudicial effect of evidence and that within each group, laypersons and attorneys frequently disagree among themselves. However, "the greatest agreement ... is found in connection with evidence suggesting immoral conduct by the defendant...." In another research project supported by the National Science Foundation, Edith Greene and Elizabeth Loftus found that "jurors' ratings of a defendant's guilt are higher when crimes are joined than when the offenses are tried separately."

Edward Imwinkelried, 1 *Uncharged Misconduct Evidence* § 1:2 [2008] (footnotes omitted).

2. As the Court said in *Thomas:*

Certainly, the indiscriminate receipt of such evidence in volume and scope can predispose the minds of the jurors to believe the accused guilty of the specific crime by showing him guilty or charged with other crimes. Moreover, the admissibility of the collateral crimes raises collateral issues which compel the defendant to meet charges of which the indictment gives him no information; which confuse his strategy of defense; and which raise such a variety of issues that the jury's attention is diverted from the charge immediately before it. This result, obviously prejudicial, is to be avoided by prompt objection on the part of the defense and close attention and control by the trial court to insure that an accused receives a fair trial when he is being subjected to zealous prosecution.

*Thomas*, 157 W.Va. at 656, 203 S.E.2d at 456.

3. *See also*, Syllabus Point 8, *State v. Ramey*, 158 W.Va. 541, 212 S.E.2d 737 (1975) ("It is the policy of the law that matters which are collateral to material issues of a criminal trial shall not obfuscate the main issues of the case or be introduced for the purpose of prejudicing the defendant by making him respond to a separate criminal charge; accordingly, absent a proper foundation for the introduction of an otherwise collateral matter, the court, in the exercise of sound discretion, should refuse such proffer.").

other bad acts.[4] The 1975 Rule 404(b) stated:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

With a few variations, this Court adopted the most of the *Federal Rules* into the *West Virginia Rules of Evidence* in 1985.[5]

Because of the potentially decisive impact of uncharged misconduct, and its countervailing prejudicial character, defense attorneys vigorously contest the use of uncharged misconduct evidence. Consequently, Rule 404(b) disputes are *the most frequently litigated evidentiary issue in appellate courts.*[6] In an unscientific search of West Virginia cases, I found at least 78 published criminal cases in the last 20 years where the admission of other bad acts under *W.Va.R.E.* Rule 404(b) was disputed on appeal.[7]

In many cases, I believe that Rule 404(b) is being applied inconsistently. It appears that prosecutors and trial courts often search for a convenient "pigeonhole" to admit proof of other bad acts, then perform a perfunctory balance of the probative value against its prejudicial effect before admitting the other bad acts evidence.[8] *See* Syllabus Point 1,

---

4. "Despite the common law's exclusionary approach, the drafters of the Federal Rules also endorsed the inclusionary notion that the more evidence presented at trial, the more likely the fact finder will learn the 'truth.' This latter policy encourages the admission of even marginally relevant evidence." Stephanie Yost, "Reversals of Fortune: How the Ninth Circuit Reviews Erroneously Admitted "Other Acts" Evidence Under Federal Rule of Evidence 404(b)," 23 S.W.U.L.Rev. 661, 667 (1994)

5. Our Rule 404(b) was amended in 1994, and now reads:

 (b) *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

6. As Professor Imwinkelried states:

 Because of the potentially decisive impact of uncharged misconduct, plaintiffs and prosecutors frequently offer such evidence. Because of the evidence's prejudicial character, defense attorneys vigorously resist the offers. The result is that there is a massive body of case law on uncharged misconduct. The admissibility of uncharged misconduct is the most frequently litigated evidentiary issue on appeal. In the mid-1980's a WESTLAW search of key numbers 369 (Other offenses as evidence of offense charged in general), 370 (Acts showing knowledge), and 371 (Acts showing intent or malice or motive) revealed 11,607 state cases … and 1,894 federal cases. Virtually every regional reporter advance sheet contains a new uncharged misconduct opinion, and the federal advance sheets ordinarily contain two or three new decisions on the topic.

 Edward Imwinkelried, 1 *Uncharged Misconduct Evidence* § 1:4 [2008] (footnotes omitted). *See also*, Stephanie Yost, "Reversals of Fortune: How the Ninth Circuit Reviews Erroneously Admitted "Other Acts" Evidence Under Federal Rule of Evidence 404(b)," 23 S.W.U.L.Rev. 661 (1994) ("The substantive impact of the Federal Rules of Evidence is especially dramatic in the case of Rule 404(b), which has generated more reported decisions than any other subsection of the Federal Rules."); Kenneth J. Melilli, "The Character Evidence Rule Revisited," 1998 B.Y.U.L.Rev. 1547, 1556 (1998) ("The practical impact of Rule 404(b) must be understood not only in the proportion of cases in which these issues are resolved, but also in the quantity of such cases in which these issues materialize. Rule 404(b) accounts for a greater number of published judicial opinions than any other provision in the Federal Rules of Evidence, and the introduction of evidence of uncharged criminal conduct under Rule 404(b) has apparently increased substantially since 1975, when the Federal Rules of Evidence were enacted.").

7. To put this number in context, the *2007 Statistical Report* issued by the Court indicates we reviewed 25 criminal cases in 2007. This suggest that about 1 in 6 criminal cases on appeal involves other bad acts evidence admitted under Rule 404(b).

8. "It is time to admit that in the real world of criminal prosecutions, the prosecutor will be able to prove relevant specific instances of the accused's uncharged misconduct by employing the 'magic words' vocabulary of Rule 404(b) to frame some intermediate issue in the case, unless

*State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994). Because a trial court's review of questions under Rule 404(b) are discretionary, on appeal this Court has rarely found that the trial court abused its discretion in admitting the other bad acts evidence. *See State v. LaRock*, 196 W.Va. 294, 312, 470 S.E.2d 613, 631 (1996). If the Court does find the trial court abused its discretion, then this Court will often then hold that the admission of the other bad acts evidence in a criminal case was "harmless error." *LaRock*, 196 W.Va. at 312 n. 28, 470 S.E.2d at 631 n. 28. *See also*, Rule 52(a), *W.Va. Rules of Criminal Procedure* [1981] ("Harmless Error. Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").

### E.

### *An Equitable Solution*

I am in agreement with the following commentator who says that, in the context of criminal prosecutions, there is nothing "harmless" about the admission of other bad acts evidence.

> Despite its name, the harmless error doctrine, at least in the context of Rule 404(b) errors, is not "harmless" to anyone.
>
> First, the harmless error doctrine wastes judicial resources. The purported justification of this doctrine is that it conserves judicial resources by preserving convictions infected by Rule 404(b) errors in cases in which the other, admissible evidence of the defendant's guilt is "overwhelming." This justification is dubious at best. If the remaining evidence indicating the defendant's guilt is otherwise so "overwhelming," then why admit "other acts" evidence in the first place? The alleged "need" for the other acts evidence should be evaluated in light of the issues and other evidence available to the prosecution. If overwhelming proof is truly available, then there is no need for admission of the erroneous "other acts" evidence. This unnecessary evidence serves to distract and

mislead the jury. In fact, inadmissible "other acts" evidence ensures there will be an ultimately futile appeal, which merely wastes the resources of the appellate courts, if not those of the litigants and their advocates.

> Moreover, in the case of clearly erroneous admissions of "other acts" evidence, the "overwhelming evidence" argument is circular. It places an inexorable temptation before the prosecution to offer, and the district judge to admit, all evidence, even that of questionable value, to create an "overwhelming" case against the defendant. This, in turn, encourages the admission of additional weak evidence because the more overwhelming the indication (or implication) of guilt, the greater the available protection under the harmless error doctrine.

> Second, the harmless error doctrine ... is intellectually indefensible. The harmless error cases were frequently factually indistinguishable from those cases in which Rule 404(b) errors required reversal. But reversals must be grounded on discernible law, not luck. When Rule 404(b) error is clear, no meaningful distinction between "abusive" and "harmless error" is possible....

> Third, application of the harmless error doctrine to Rule 404(b) errors is unfair to the defendant. The broad discretion and the great deference granted to trial judges in the admission of Rule 404(b) evidence, together with the long list of acceptable purposes under which "other acts" evidence may be admitted, already tilts the Rule 404(b) playing field sharply in the government's favor. The Rule is applied in such an inclusionary manner that propensity is the only purpose for which the evidence may not be admitted. Without a countervailing policy of reversing clear Rule 404(b) errors, the defendant's right not to be convicted for being a "bad" person, rather than for the crime charged, is meaningless. It is not too much to require

---

the trial judge believes that the probative value of other uncharged misconduct is substantially outweighed by prejudice to the accused, waste of time, or confusion of the jury." Thomas J. Reed,

"Admitting the Accused's Criminal History: The Trouble with Rule 404(b)," 78 Temp.L.Rev. 201, 250–51 (2005).

both that district judges exercise greater care in excluding clearly erroneous "other acts" evidence...

Moreover, in the interest of fairness to the accused, what little territory these Rules still protect should be carefully guarded. An individual's personal freedom is at stake in the criminal setting; thus greater, not lesser, adherence by district courts to the Federal Rules should be required.

Stephanie Yost, *supra*, 23 S.W.U.L.Rev. at 684–86.

I realize that I will never convince our Court to revert back to the correct rule set out in *State v. Miller, supra*, in 1915. I therefore propose that Rule 404(b) be amended, either directly or through this Court's jurisprudence, to eliminate the "harmless error" safety net that prosecutors, trial courts, and this Court have relied upon to uphold convictions based upon the admission of uncharged misconduct. I am not advocating for the abrogation of the harmless error rule, only its elimination from our Rule 404(b) jurisprudence.

When a trial court has abused its discretion and admitted irrelevant or prejudicial bad acts evidence, I would hold that reversal and remand for a proper trial should be automatic, no matter how much evidence is otherwise presented. Removing Rule 404(b) errors from the protection of the harmless error rule would force prosecutors and trial judges to limit the evidence to relevant evidence pertaining to the specific charge in the indictment. It would force prosecutors and trial judges to make more careful, consistent and hopefully more equitable decisions about the admission of uncharged misconduct in criminal trials.

I otherwise respectfully concur with the majority's decision.