687 S.E.2d 360

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Michael E. MARTIN, Defendant Below, Appellant.**

No. 34709.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 2005.

Decided Nov. 23, 2009.

Gregory L. Ayers, Esq., Ira Mickenberg, Esq., Public Defender Corporation, Charleston, WV, Attorneys for the Appellant.

Kristen L. Keller, Esq., Prosecuting Attorney's Office, Beckley, WV, Attorney for the Appellee.

PER CURIAM:

This case is before the Court from the final Order of the Circuit Court of Raleigh County, West Virginia, presumably entered on January 18, 2008,[1] denying the Appellant's, Michael E. Martin's, post-trial motions and sentencing him to life without mercy after a jury convicted him of first degree murder with no recommendation of mercy. The Appellant was also sentenced to serve one to five years for his jury conviction of felony conspiracy.[2] Based upon a review of the

1. There is no date reflected upon the Order that indicates the date the Order was actually entered by the Circuit Court of Raleigh County.

2. The two sentences were to run consecutively and the Appellant was given credit for time served from August 29, 2006, through January 18, 2008.

record, the parties' briefs and arguments, and all other matters before the Court, we find that reversible error was committed during the trial of this matter and, accordingly, the Court reverses the conviction and remands this case for a new trial.

## I. Factual and Procedural History

In the early morning of August 29, 2006, Corporal Charles E. "Chuck" Smith, III, of the Beckley Police Department was shot and killed during an undercover drug deal. On August 28, 2006, Cpl. Smith and Corporal William Reynolds, also of the Beckley Police Department, went out for dinner, followed by stops at various bars. At some point during the evening, the two were joined by Cpl. Smith's girlfriend, Jasminda Gonzales.[3] The evidence was clear that Cpl. Smith and Cpl. Reynolds were not on duty; however, there was evidence that officers in the narcotics unit were on-call twenty-four hours a day.

While at the Pikeview Lounge, an individual named Timothy Blackburn approached Cpl. Smith about a drug deal that was going to occur involving Jelly Bread, a well-known drug dealer. The officers and Ms. Gonzales left the bar in Cpl. Smith's jeep and followed Mr. Blackburn to the location where the drug deal was going to occur, which was at an apartment complex where a woman named Alfreda "Freda" Lawson lived. After waiting for a period of time, nothing transpired and Mr. Blackburn left.

The officers, however, were approached by Ms. Lawson, who advised them that she could find a dealer to sell them drugs, because it looked like Jelly Bread was not going to show. Ms. Lawson offered the officers, whom she apparently did not know were police, her keys as a security deposit, so if the officers were robbed, the officers would have access to her apartment. At Ms. Lawson's request, Cpl. Smith followed Ms. Lawson and another male who had been inside Ms. Lawson's apartment, Bobby Cook, around the corner from Ms. Lawson's apartment complex to an abandoned swimming pool area that was known for local drug trafficking. Cpl. Reynolds and Ms. Gonzales traveled to the same area in Cpl. Smith's vehicle. Officer Smith ultimately returned to the vehicle and nothing occurred at this point.

Subsequently, the two officers and Ms. Gonzales stopped a suspicious red vehicle. Cpl. Reynolds had the license plate checked on the vehicle and the occupants were patted down, but ultimately released without incident.

Thereafter, Cpl. Smith, Cpl. Reynolds, and Ms. Gonzales returned to Ms. Lawson's home to return keys that Ms. Lawson had left as security for the drug transaction that she attempted to arrange. There was evidence that Cpl. Reynolds screamed and cussed at Ms. Lawson and that Ms. Lawson yelled that "[y]ou are the police and I'm not coming out."

At this point, the Appellant, Michael Martin, appeared for the first time on the street. Even though Cpl. Reynolds testified that the Appellant approached him, the Appellant stated that he was approached by the police. Cpl. Reynolds testified that the Appellant offered to obtain drugs for Cpl. Smith. The Appellant used Cpl. Smith's cell phone to call someone, later identified as Thomas Leftwich, to arrange a drug deal. After this, the two police officers, Ms. Gonzales, and the Appellant left in Cpl. Smith's vehicle. The Appellant asked Cpl. Smith for front money for the drugs and Cpl. Smith refused to give him any money.

The foursome ultimately parked across the street from a house. The Appellant walked toward the house, reached the bottom street-level stairs, and then returned to the Jeep without going into the house. At that point, the Appellant used Cpl. Smith's cell phone to place another call. Cpl. Smith and the Appellant argued about who would go into the house. The Appellant asked Cpl. Smith to go in alone and Cpl. Smith refused.

Ultimately, Cpl. Smith and the Appellant walked toward the house. Cpl. Smith and the Appellant were standing at the bottom of the street-level stairs, looking up at a person who stood on the steps. Cpl. Reynolds heard

---

**3.** By the time of trial, Ms. Gonzales had married and her married name was Jasminda Curran; however, for the purposes of this opinion, the Court refers to Mrs. Curran by her maiden name.

a "quick confrontation of words." Ms. Gonzales testified that she saw Cpl. Smith hand something to the person on the stairs. Cpl. Reynolds saw Cpl. Smith pull out his badge before shots were fired. Cpl. Smith died from the bullet wounds he received. The Appellant fled the scene and was later arrested at the home of his stepfather, Onie Cook. The shooter was Thomas Leftwich, the person the Appellant had called in trying to arrange the drug transaction. Thomas Leftwich was convicted of first degree murder.

The Appellant did not testify at his trial or offer any evidence at trial even though he relied upon the defense of entrapment. According to his statement given to police, which was introduced into evidence during the trial, the Appellant stated that he did not know Mr. Leftwich and had only gotten his phone number earlier the same day of the shooting. He had no idea that Mr. Leftwich was armed or that he would shoot the police officer. While the Appellant confessed to being involved in a drug transaction, namely the delivery of cocaine, he did not confess to the murder of Cpl. Smith.

The jury was instructed on premeditated murder and felony murder, including the underlying felonies of delivery and attempted delivery of a controlled substance and robbery, as well as attempted robbery. The underlying robbery charge was given, notwithstanding that the indictment against the Appellant indicated the sole underlying crime supporting felony murder was the delivery and attempted delivery of a controlled substance. The jury, after deliberating, convicted the Appellant of first degree murder as charged in Count 1 of the indictment, with no recommendation of mercy, and felony conspiracy.

## II. Discussion of Law

### Expert Testimony as to Witness Credibility

The Appellant claims that the circuit court erred in allowing Captain Scott Van Meter, a trooper with the West Virginia State Police, who was also the chief investigator for the State, to testify, over objection, to his opinion that the two main prosecution witnesses, referring to Cpl. Reynolds and Ms. Gonzales, were telling the truth.

At issue regarding this alleged error is the following testimony concerning credibility:

(By Ms. Keller of Captain Van Meter):

Q. In your years of experience and—22 years of experience and as a result of your training, have you—do you have familiarity with comparisons of witnesses' testimony?

A. Yes, I do.

Mr. Daniell: Objection, Your Honor. We might want to approach.

The Court: Okay.

(Counsel approaches the bench.)

Mr. Daniell: Judge, I have not perfected the reading of other people's minds quite yet. However, I'm a little suspicious that from the introduction of that question, we may be attempting to elicit testimony from Captain Van Meter about the credibility of witnesses. That is a sole question for the jury. I think it would be highly improper to have a witness for the State to vouch for or to demean the credibility of any particular witnesses, unless—I ain't vouching for Paul Leftwich. If he wants to call Paul Leftwich a liar, he can do it. I won't object to that. But outside Paul Leftwich or any Leftwiches, I didn't believe them. But, you know, I'm not sure if that's were we're going or not, but we need to be real careful.

Ms. Keller: Except the rules of evidence specifically allow that after the credibility of a witness has been impeached, that witness's credibility will be able to be rehabilitated by another witness. And so the rules of evidence allow.

Mr. Daniell: Well, yeah, you can rehabilitate them. But that's—that, you know, you've got to rehabilitate them substantively. Not just like—oh, well, I'm a trooper and I think he's believable.

Ms. Keller: Well, we're getting to the substance.

Mr. Daniell: Well, let's just get to the substance and maybe not the opinion.

Ms. Keller: You can rehabilitate credibility by another witness's opinion as to that witness's credibility. It's specifically

provided for under the rules. And if you ask it that way, then—

. . .

Ms. Keller: Anyway it's provided for under the rules of evidence. I believe it's 609 or 608.

The Court: I'll allow it. I'll preserve your exception, Mr. Daniell.

. . .

(By Ms. Keller):

Q. From your—well, first of all, in your 24 years of experience as a West Virginia State Policeman have you had experience throughout those 22 years in conducting witness interviews and particularly eyewitness interviews?

A. That's correct.

Q. Have you, in those 22 years, had substantial experience in conducting such interviews in cases of violent crimes being homicide or sexual assaults, for example.

A. That's correct.

Q. And in your experience in those 22 years, is it rare—is it usual or unusual that your eyewitnesses will have discrepancies in some of the details?

A. Usual.

. . .

Q. Now, as to your investigation of this case and coupled with your 22 years of experience as a law enforcement officer and captain of the State Police, from your entire investigation of this case, have you determined Officer Will Reynolds to be credible?

A. Yes.

Mr. Daniell: Objection, Your Honor. That's—that I think is where we are out of bounds.

The Court: I am going to overrule the objection, but I'll preserve your exception.

(By Ms. Keller):

Q. And based upon your investigation in this case and years of experience and your present position with the West Virginia State Police, have you also determined Jasminda Gonzales to be credible and believable in this case?

Mr. Daniell: Same objection, Your Honor.

The Court: All right. And the same ruling.

The Witness: Yeah.

The instant case requires this Court's review of the introduction of evidence during the direct examination of the Appellee's chief investigating officer pertaining to the credibility of certain key witnesses for the State. In *State v. Walker,* 207 W.Va. 415, 533 S.E.2d 48 (2000), the Court stated that

> "[t]he evidentiary rulings of a circuit court, including those affecting constitutional rights, are reviewed under an abuse of discretion standard." *State v. Marple,* 197 W.Va. 47, 51, 475 S.E.2d 47, 51 (1996) (citations omitted). Moreover, "[e]ven if we find the circuit court abused its discretion, the error is not reversible unless the defendant was prejudiced." *Id.* (citing *State v. Guthrie,* 194 W.Va. 657, 684, 461 S.E.2d 163, 190 (1995)).

*Walker,* 207 W.Va. at 417–18, 533 S.E.2d at 50–51. With this standard of review in mind, the Court now turns to resolving the first issue of this appeal.

■ The review of this particular issue is simplified, somewhat, by the Appellee's concession of error. The Appellee conceded error in its brief when it stated that "[t]he prosecutor went about the intended course of examination inartfully and the two questions cited in the Appellant's brief ... should not have been phrased as they were." Additionally, during oral argument before this Court, the Appellee stated that it was "stupid" to ask any question regarding the credibility of a witness.

A review of the transcript reveals the line of questioning pursued by the Appellee appears calculated, rather than "stupid" or "inartful." The Appellee laid a foundation for Capt. Van Meter as an expert and then asked his "opinion" as to whether Ms. Gonzales and Cpl. Reynolds were credible in the testimony that they each gave. That line of questioning, while possibly motivated by the emotions surrounding the death of a police officer, was wholly unnecessary in this case.

■ To add insult to injury, the Appellee, in turn, relied upon incorrect authority to support its position that the questioning on credibility was proper. The Appellee argued below that the credibility questioning of Capt. Van Meter was permissible under either West Virginia Rule of Evidence 608 or 609.[4] West Virginia Rule of Evidence 608 provides:

> (a) *Opinion and reputation evidence of character.*—The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness; and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

*Id.* Likewise, in syllabus point two of *State v. Wood,* 194 W.Va. 525, 460 S.E.2d 771 (1995), the Court held:

> *West Virginia Rules of Evidence* 608(a) permits the admission of evidence in the form of an opinion or reputation regarding a witness's character for truthfulness or untruthfulness, subject to two limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness; and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise. The admission of testimony pursuant to *W. Va. R. Evid.* 608(a) is within the sound discretion of the trial judge and is subject to *W. Va. R. Evid.* 402, which requires the evidence to be relevant; *W. Va. R. Evid.* 403, which requires the exclusion of evidence whose "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[;]" and *W. Va. R. Evid.* 611, which requires the court to protect witnesses from harassment and undue embarrassment.

*Wood,* 194 W.Va. at 528, 460 S.E.2d at 774, Syl. Pt. 2.

4. Even a cursory review of West Virginia Rule of Evidence 609, which governs the impeachment by evidence of conviction of a crime, readily

■ There is no evidence that either Ms. Gonzales's or Cpl. Reynolds's character for truthfulness was attacked by opinion or reputation evidence or otherwise. W. Va. R. Evid. 608(a). While both witnesses were subjected to cross-examination regarding various factual discrepancies, the questioning never crossed the bounds into any type of attack on the character of either witness. Even under West Virginia Rule of Evidence 608(a) the impeachment of credibility alone is not sufficient to trigger an attack on character.

■ Even more significantly, the law in West Virginia does not allow an expert to give an opinion regarding the credibility of a witness. It is a well-established legal principle in this State that "[t]he jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses." Syl. Pt. 2, *State v. Bailey,* 151 W.Va. 796, 155 S.E.2d 850 (1967); *accord State v. McCoy,* 179 W.Va. 223, 229, 366 S.E.2d 731, 737 (1988)("It is well settled in this State, however, that the jury is the sole judge as to the credibility of witnesses."). Further, in *State v. Edward Charles L.,* 183 W.Va. 641, 398 S.E.2d 123 (1990), we held, regarding the admissibility of psychological testimony in cases involving incidents of child sexual abuse, that *"an expert may not give an opinion as to whether he personally believes the child,* nor an opinion as to whether the sexual assault was committed by the defendant, as these would improperly and prejudicially invade the province of the jury." *Id.* at 644, 398 S.E.2d at 126, Syl. Pt. 7, in part (emphasis added).

■ Under West Virginia case law, because the credibility of witnesses falls within the province of the jury and not an expert witness, the circuit court erred in allowing the Appellee to engage in this line of questioning regarding credibility. Despite this lapse in judgment by both the State and the circuit court, the error is not reversible unless the defendant was prejudiced. *Walker,*

reveals that it does not support the Appellee's argument regarding the admissibility of expert opinion relating to the credibility of a witness.

207 W.Va. at 417–18, 533 S.E.2d at 50–51; *see State v. Guthrie*, 194 W.Va. 657, 684, 461 S.E.2d 163, 190 (1995) ("As to error not involving the erroneous admission of evidence, we have held that nonconstitutional error is harmless when it is highly probable the error did not contribute to the judgment.... On the other hand, when dealing with the wrongful admission of evidence, we have stated that the appropriate test for harmlessness articulated by this Court is whether we can say with fair assurance, after stripping the erroneous evidence from the whole, that the remaining evidence was independently sufficient to support the verdict and the jury was not substantially swayed by the error.") (citation and footnote omitted).

Based upon a review of the entire record in this case, the Court concludes that the abuse of discretion was prejudicial to the Appellant. *Walker*, 207 W.Va. at 417–18, 533 S.E.2d at 50–51. This determination is based upon the fact that the Appellant confessed to playing an integral role in the attempted delivery of a controlled substance that resulted in the shooting death of Cpl. Smith; however, the Appellant denied having any involvement in the shooting of Cpl. Smith. The Appellant's primary defense to the charge was entrapment. Regarding the assertion of entrapment, the critical evidence offered by the Appellant was that the inception or the idea for the whole drug transaction began with the police. In this regard, there was conflicting evidence concerning the facts leading up to the actual shooting that had an impact upon the Appellant's entrapment defense, and ultimately on the trial. The Appellant, in his statement, indicated that he was approached by the police officers regarding the purchase of drugs. Cpl. Reynolds, however, testified that the Appellant approached him and Cpl. Smith, asking if they were looking to buy drugs. Additionally, there was conflicting testimony between that offered by Cpl. Reynolds as opposed to that offered by Ms. Gonzales. For instance, Ms. Gonzales testified that Cpl. Smith, with the Appellant standing next to him, handed what Ms. Gonzales presumed was money to his assailant prior to the shooting. Cpl. Reynolds, however, did not mention any such exchange in his testimony. Thus, undeniably there was the need for the jury to determine which testimony it found was credible. This jury determination was significantly encroached upon when the Appellee obtained expert testimony from a West Virginia State Police Officer that the officer found that Cpl. Reynolds and Ms. Gonzales, who were the State's key witnesses, were believable and credible. This expert testimony improperly bolstered these key witnesses's credibility. This leads the Court to the inevitable conclusion that the Appellee's questioning relative to credibility invaded the province of the jury so substantially as to prejudice the Appellee. The credibility questions posed by the Appellee violated clear legal principles established by the Court. Accordingly, the Court reverses the decision of the circuit court, based upon the error regarding the expert testimony as to witness credibility of the two key witnesses for the State. There are other errors raised by the Appellant; however, it is not necessary to address these errors due to the Court's decision to reverse the Appellant's conviction based upon the prejudicial credibility testimony.[5]

### III. Conclusion

Based upon the foregoing, the decision of the Circuit Court of Raleigh County is reversed and remanded for a new trial.

Reversed and remanded.

---

5. The Court is concerned by the performance of defense counsel during the Appellant's trial. Defense counsel was lax during trial regarding evidence that was admitted against the Appellant, without objection. The performance of defense counsel may very well have given rise to appropriate habeas corpus claims for ineffective assistance of counsel, but for this Court reversing the case on direct appeal.