# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**FILED**
**December 16, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs.) No. 19-0635** (Grant County 17-F-66)

**Brenda Cook,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Brenda Cook, by counsel Lawrence E. Sherman, Jr., appeals the June 11, 2019, order of the Circuit Court of Grant County that sentenced her on fourteen counts of "obtaining money by false pretenses" and eight counts of "uttering." Respondent State of West Virginia, by counsel Benjamin F. Yancey, III, filed a response in support of the circuit court's order. Petitioner filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Following an investigation by the West Virginia Department of Health and Human Services' Inspector General's Office, petitioner Brenda Cook was originally indicted for crimes related to at least 148 checks totaling $116,628.89 that were allegedly written between 2006 and 2011. These charges arose from petitioner's work as the Family Support Coordinator for the Potomac Highland Guild, Inc. (the "Guild"). In that role, petitioner assisted those in need of funding for assistive devices from the West Virginia Department of Health and Human Resources ("DHHR"). However, the circuit court dismissed the indictment without prejudice in 2015.

In November of 2017, petitioner was indicted on fifteen counts of forgery in violation of West Virginia Code § 61-4-5, fifteen counts of uttering in violation of West Virginia Code § 61-4-5, fifteen counts of taking the identity of another person in violation of West Virginia Code § 61-3-54, and fourteen counts of obtaining money under false pretenses in violation of West Virginia Code § 61-3-24(a). These charges also arose from petitioner's work for the Guild. The charges focused on twenty-four checks dated October 5, 2012, from fifteen client accounts that totaled $22,600. The State claimed petitioner diverted that amount for her own use by depositing the money into her credit card accounts and using it to pay her bills.

1

Petitioner rejected an offer to plead guilty to five felonies, pay restitution, and serve one to ten years in prison.

Prior to petitioner's trial, the State moved pursuant to Rule 404(b) of the West Virginia Rules of Evidence to admit into evidence the 148 checks on 96 client accounts totaling $116,628.89, that were the subject of petitioner's first/dismissed indictment. At the hearing on the motion, the State called Gwen Grove, an investigator from the Department of Health and Human Services' Inspector General's Office, who was assigned to petitioner's case. Ms. Grove testified as follows:

*The State*: Now, [petitioner, in her second indictment] is charged with multiple offenses dealing with applications and [twenty-four] checks that were from October 2012; is that correct?

*Ms. Grove*: Yes.

*The State*: Now, . . . did it become apparent that she was representing that she was either being framed or set up as a result of being a whistleblower [alleging the Guild committed Medicaid fraud]?

*Ms. Grove*: Yes.

*The State*: . . . I want the [c]ourt to correct . . . the 404(b) motion[.] On the fourth line, it says there are 93 additional contracts. Miss Grove did you miscount, and are there 96?

*Ms. Grove*: I did. I recounted yesterday, and there are 96.

*The State*: All right. How many additional checks did your investigation team determine – not counting the ones in 2012 [for which petitioner was indicted] – were directed into Ms. Cook's personal credit card accounts, [that paid] her bills?

*Ms. Grove*: An additional 148 checks.

*The State*: And of those 148 checks, how much additional money, in addition to the 15 charged in the current indictment, was your investigatory team able to trace into her accounts.

*Ms. Grove*: $116,628.89

Over petitioner's objection, the circuit court granted the State's motion and allowed the evidence to be introduced as proof of petitioner's intent, motive, common scheme, plan, or absence of mistake.

Petitioner's four-day trial took place in March of 2019. During voir dire, the court asked the venire whether any of them (1) knew petitioner socially or through business; (2) had a state of

mind or belief that would prevent them from being impartial; (3) could disregard anything they might have heard about the case and render an impartial verdict; (4) knew any of the witnesses, including defense witness Frank Brent; and (5) were conscious of a bias for or against petitioner that would interfere with their ability to be impartial. Venire member Victor Owens, who ultimately sat on the jury, did not respond to any of these questions.

At trial, the State presented evidence that petitioner used her position at the Guild to unlawfully transfer twenty-four checks, on October 5, 2012, totaling $22,600 to her credit card accounts. The checks were connected to fifteen Guild accounts for which petitioner was responsible. The State also presented the Rule 404(b) evidence that petitioner transferred an additional 148 checks, totaling $116,628.89, from Guild accounts for which petitioner was responsible. Petitioner's counsel moved to introduce rebuttal evidence, a three-ring binder containing petitioner's credit card statement, receipts, and other documents. However, the court ruled that the contents of the binder were inadmissible because they were not provided to the State until a week before trial, and past the discovery deadline.

Following the close of all evidence and a lunch break on the third day of trial, March 28, 2019, petitioner's counsel reported he had just learned from petitioner that she received a phone call from defense witness Frank Brent on the evening of March 27, 2019.[1] Mr. Brent testified earlier on March 27th at petitioner's trial. Petitioner's counsel told the court that Mr. Brent said he recognized juror Victor Owens as a former coworker and that, when the two worked together, they argued almost to the point of blows regarding whether petitioner had committed a murder in the 1990s.[2] Mr. Brent stated that Juror Owens believed petitioner committed the murder, while he believed petitioner was innocent. Petitioner's counsel then called Mr. Brent on the phone. Petitioner's counsel said that Mr. Brent verified what he said to petitioner the night before. Mr. Brent also told petitioner's counsel that he believed his encounter with Mr. Owens occurred in 2011. Following the lunch break on March 28, 2019, petitioner's counsel asked to voir dire Juror Owens in the courtroom based on Mr. Brent's claims. The court responded as follows:

*Circuit Court*: Why would we voir dire him now?

*Petitioner's Counsel*: I mean, if it was over my client and whether or not she was a murderer or it was a justified homicide or whatever, it maybe – I think it's a real issue.

---

[1] Later, petitioner said that Witness Brent both spoke to her during a break at trial on March 27, 2019, regarding juror Victor Owens and called her again that evening to discuss Juror Victor Owens.

[2] Petitioner was convicted of second-degree murder in 1997. However, on appeal, this Court vacated that conviction and remanded the case for the entry of a judgment of acquittal. The Court found that the State failed to prove beyond reasonable doubt that defendant did not act in defense of another in shooting the victim. *See State v. Cook*, 204 W. Va. 591, 593-94, 515 S.E.2d 127, 129-30 (1999). The dispute between defense witness Frank Brent and Juror Victor Owens allegedly occurred in 2011 and regarded whether petitioner had, in fact, committed the murder.

3

*Circuit Court*: I mean, we never discussed this during trial.

*Petitioner's Counsel*: No, we didn't. But he may be, obviously prejudiced against my client if he feels that way about her. He should have raised his hand and said, "I can't be fair and impartial." I mean if he feels so passionate about her and called her a—

*Circuit Court*: You don't know that he can't, except you got an opinion from Frank Brent that some time, in the past, they had an argument.

Petitioner's counsel also made a motion to replace Juror Owens with the alternate juror. The court denied that motion but said that if petitioner's counsel obtained any more information, he should let the court know. Thereafter, the court instructed the jury, the parties made closing arguments, the court excused the alternate juror, and the jury began to deliberate.

As the jurors deliberated, the court allowed petitioner to vouch the record regarding Mr. Brent's claims against Juror Owens. Thereafter, the State claimed that as soon as the sole alternate juror was excused, s/he sat with petitioner's supporters and was seen encouraging petitioner. The State opined that the alternate juror was tainted and, therefore, had been properly excused the day before. The State also speculated that Mr. Brent's claim regarding Juror Owens was "nothing more than a ruse to get rid of [a juror], so that [petitioner's] friend, the alternate would become one of the [jurors]." The court concurred that the alternate was "tainted definitely by now" and that "we're going to continue with [the jury] we have." The court also noted, apparently in error, that "Mr. Brent's father was a key witness in [petitioner's] acquittal [at her murder trial]."

The jury convicted petitioner on twenty-two of the fifty-nine counts: eight counts of uttering and fourteen counts of obtaining money under false pretenses. The jury acquitted petitioner on the remaining thirty-seven counts.

At petitioner's June 6, 2019, sentencing hearing, her counsel again raised the issue of Juror Owens' alleged bias and asked that the court bring all the jurors back into court to determine whether Juror Owens had improperly influenced the jury during their deliberations. The court replied that it was "not going to start letting people interview jurors when they lose cases" as it was "against every rule we got." The court also noted that petitioner was purely speculating that Juror Owens had wrongfully influenced the jury. The State highlights that petitioner did not call Mr. Brent to testify regarding his claims about Juror Owens at her sentencing hearing.

By order entered June 11, 2019, the circuit court ordered petitioner to pay restitution. The court then sentenced petitioner to one to ten years in prison on each of the twenty-two counts, with counts one to seven to be served consecutively, and counts eight to twenty-two to be served concurrently, beginning on the date petitioner starts her sentence on the eighth count. Petitioner's net effective sentence is eight to eighty years in prison.

Petitioner now appeals. Petitioner first argues that the circuit court erred by denying her the right to a fair trial when it failed to examine Juror Owens regarding his potential bias toward petitioner and, instead, discharged the alternate juror and sent the case to the jury that included

Juror Owens.

"The determination concerning whether and the extent to which to permit individual *voir dire* rests within the sound discretion of the trial court, and is not subject to review in the absence of an abuse of discretion." *State v. Lassiter*, 177 W. Va. 499, 503, 354 S.E.2d 595, 599 (1987) (citing *State v. Beacraft*, 126 W.Va. 895, 30 S.E.2d 541 (1944); *State v. Ashcraft*, 172 W.Va. 640, 309 S.E.2d 600 (1983)).

> "A motion for a new trial on the ground of the misconduct of a jury is addressed to the sound discretion of the court, which as a rule will not be disturbed on appeal where it appears that defendant was not injured by the misconduct or influence complained of. The question as to whether or not a juror has been subjected to improper influence affecting the verdict is a fact primarily to be determined by the trial judge from the circumstances, which must be clear and convincing to require a new trial; proof of mere opportunity to influence the jury being insufficient." Syllabus point 7, *State v. Johnson*, 111 W.Va. 653, 164 S.E. 31 (1932).

Syl. Pt. 1, *State v. Daniel*, 182 W. Va. 643, 391 S.E.2d 90 (1990).

We first note that petitioner never brought Mr. Brent back into court following his March 27, 2019, testimony so that he could address the court regarding his alleged claims regarding Juror Owens while petitioner's trial was still ongoing. Nor did the defense call Mr. Brent at petitioner's sentencing hearing when petitioner again complained about Juror Owens's alleged bias. Petitioner's failure to do so is significant. Absent such sworn testimony from Mr. Brent, petitioner's claims are merely speculative and, as the State suggests, may have been falsely raised in an effort to assist petitioner.

We also find that the jury's verdict further undermines petitioner's speculative claims. The jury, which included Juror Owens, acquitted petitioner of thirty-seven of the fifty-nine counts after hearing all the evidence at trial. As for the twenty-two charges of which petitioner was convicted, the entire jury convicted her of those counts. Moreover, no juror informed the court that any one juror had unduly influenced their deliberations or behaved contrary to the court's instructions. Absent any evidence other than Mr. Brent's unsubstantiated claims, we find that petitioner fails to show that she was prejudiced when the trial court rejected her motion to individually voir dire Juror Owens. Accordingly, we find no error.

Petitioner next argues that the circuit court denied petitioner her right to a fair trial when it failed to allow petitioner to interview jurors other than Juror Owens to determine whether Juror Owens's bias against petitioner influenced the verdict. We have said, "[a] jury verdict may not ordinarily be impeached based on matters that occur during the jury's deliberative process which matters relate to the manner or means the jury uses to arrive at its verdict." Syl. Pt. 1, *State v. Scotchel*, 168 W. Va. 545, 285 S.E.2d 384 (1981). As noted above, petitioner did not raise her claim regarding Juror Owens until the close of all evidence and never produced Mr. Brent so that he could verify his claims. Further, the alleged incident supposedly happened in 2011, eight years prior to petitioner's trial. In its post-trial order, the circuit court noted that it did "not desire to question . . . [J]uror [Owens] . . . on matters . . . which if they occurred at all, happened remote in

5

time to this jury trial." Petitioner also fails to show that she was specifically prejudiced by the circuit court's ruling. Thus, we find that the circuit court did not err in denying petitioner's motion to voir dire the other jurors regarding Juror Owens.

In petitioner's third assignment of error, she argues that the circuit court erred in admitting evidence of the additional 148 checks deposited into petitioner's credit card accounts as "other acts" evidence under Rule 404(b) of the West Virginia Rules of Evidence.

> This Court reviews a lower court's determination regarding the introduction of Rule 404(b) other crimes evidence under an abuse of discretion standard. [*State v.*] *McGinnis*, 193 W.Va. [147,] at 159, 455 S.E.2d [516,] at 528 [(1994)]. We have emphasized that a circuit court abuses its discretion in admitting Rule 404(b) evidence only where the court acts in an "arbitrary and irrational" manner. *Id.*

*State v. Hager*, 204 W. Va. 28, 36, 511 S.E.2d 139, 147 (1998). "In reviewing the admission of Rule 404(b) evidence, we review in the light most favorable to the party offering the evidence . . . maximizing its probative value and minimizing its prejudicial effect." *State v. Willett*, 223 W. Va. 394, 397, 674 S.E.2d 602, 605 (2009).

As noted above, prior to trial, the State moved to admit 148 checks, totaling $116,628.89 on 96 Guild accounts that were deposited into petitioner's credit card accounts for which petitioner was not charged. Over petitioner's objection, the circuit court granted the State's motion and allowed Gwen Grove, an investigator from the Department of Health and Human Services' Inspector General's Office, to testify regarding the checks as proof of intent, motive, common scheme, plan, or absence of mistake.

> The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

*State v. Taylor*, 215 W. Va. 74, 78, 593 S.E.2d 645, 649 (2004) (quoting *State v. LaRock*, 196 W.Va. 294, 310-11, 470 S.E.2d 613, 629-30 (1996) (footnote omitted)). Under Rule 403 of the West Virginia Rules of Evidence, relevant evidence "may [be] exclude[d] . . . if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" *Id.*

Here, the circuit court conducted a Rule 404(b) hearing and instructed the jury on the limited admissibility of "other acts" evidence. However, petitioner argues that the court abused its discretion on step three of the Rule 404(b) test (whether the evidence was more probative than prejudicial). Specifically, petitioner argues that the volume of "other acts" evidence produced by the State far exceeded the conduct charged and, therefore, was unfairly prejudicial, and used to enhance the State's case, and not to prove intent, motive, common scheme, plan, or absence of mistake.

6

Our review of the record on appeal does not indicate that the State introduced the Rule 404(b) evidence to prejudice the jury against petitioner; instead, the State used that evidence to counter an issue petitioner interjected into the case: that petitioner was being prosecuted because she discovered that the Guild was committing Medicaid fraud and was "paying her back" for being a whistleblower. Therefore, because the Rule 404(b) evidence was used for a probative and relevant purpose, we find that the circuit court did not err in allowing the evidence for the purposes of showing petitioner's motive, opportunity, intent, common scheme, and plan.

The circuit court also did not err in precluding petitioner from entering her rebuttal evidence where petitioner's counsel did not give the three-ring notebook containing that evidence to the State until a week before trial and well after discovery had closed. Petitioner testified that she had been in possession of the information in the notebook since December of 2012, well before petitioner's March of 2019 trial. "Discovery orders lie within the sound discretion of a trial court." *Bartles v. Hinkle*, 196 W. Va. 381, 389, 472 S.E.2d 827, 835 (1996). Based on the facts herein, we find the circuit court did not abuse its discretion in refusing to allow petitioner's rebuttal evidence at trial.

In petitioner's fourth assignment of error, she claims that the circuit court erred in barring her evidence that her office computer at the Guild had allegedly been tampered with in order to manufacture evidence against her.

"The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. Pt. 1, *State v. Calloway*, 207 W. Va. 43, 528 S.E.2d 490 (1999) (citing Syl. Pt. 10, *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds*, *State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994)).

Petitioner states that, at trial, she attempted to show that the evidence against her was manufactured after she left her employment at the Guild, but before the DHHR conducted its investigation, a period of about a month. In support, petitioner offered the testimony of the Guild's IT manager, Brandon Judy, and a forensic computer expert, Craig Corkrean. At trial, the court allowed petitioner to question Mr. Judy, but, when petitioner was two-thirds through her examination, the court stopped the examination on the ground that the documentary evidence was not computer-generated. The court also precluded Mr. Corkrean from testifying. Petitioner highlights that a pretrial order allowed Mr. Corkrean's testimony; and that Mr. Corkrean was to address an issue that was not addressed by Mr. Judy, i.e., whether anyone manipulated petitioner's computer after she left her employment with the Guild. Petitioner contends that Mr. Corkrean would have testified that after petitioner left the Guild, (1) her computer was kept in operation; (2) her computer was repeatedly accessed; (3) one of the contracts on her computer was accessed three times; and (4) he found two Medicaid fraud reports even though the State claimed it found no such reports on petitioner's computer. Petitioner avers that this testimony could have shown the deficiency in the Inspector General's report.

Petitioner avers that she discovered that the Guild was wrongfully using the funds from the "Family Support Contract" to pay operational expenses, which amounted to Medicaid fraud. Petitioner contends that, when the court disallowed Mr. Corkrean's testimony, she was precluded

from proving her theory that, after she left the Guild, Guild workers used her office computer to manufacture evidence against her in retaliation for her discovery of the Guild's fraudulent activity. We find that the circuit court did not err in disallowing petitioner's experts' evidence. An April 2, 2019, order in this case explains that,

> During [petitioner's expert's] Mr. Judy's . . . testimony, the State objected on relevance. The [c]ourt sustained the objection[.] The State argued that any access to [petitioner's] work computer after [petitioner] was terminated from [the Guild] was irrelevant because all of the documentation used in the prosecution of this matter was retrieved from the physical files that day before [petitioner] was terminated [and a month after she was suspended from work]. Petitioner objected to that characterization and claimed that she was set up by the other employees and documents were altered after she left her employment. Petitioner likewise argued that her [forensic computer] expert witness [Mr. Corkrean would] testify to post-termination logins of [her] work computer and that those logins are part of the basis of the claim that she was set up by other employees. The evidence that was presented by the State which was unchallenged by [petitioner] on direct is that the documents that serve as the basis for the indictment were collected and preserved on December 5, 2012 [when petitioner was suspended, but a month before she was terminated]. Therefore, the State's objection is sustained on the issue. Furthermore, based upon [petitioner's] failure to show any alterations of the computer by anyone other than [petitioner] prior to her termination from [the Guild], the [c]ourt finds that the testimony of [Mr. Corkrean] is unnecessary and irrelevant. Accordingly, witness Judy was dismissed from the stand and . . . Mr. Corkrean, will not be permitted to testify in this matter.

Moreover, the following exchange occurred between the court and petitioner's expert, Mr. Judy, at trial:

> *The Court*: [Mr. Judy], let me ask you this question. Do you have any evidence that [petitioner's] computer while she was employed [with the Guild] was tampered with in any way?
>
> *Mr. Judy*: I do not have any evidence.
>
> *The Court*: Do you have any evidence or knowledge that [petitioner's computer] was tampered with inappropriately after she left [the Guild]?
>
> *Mr. Judy*: I do not.

Based on our review of the trial court's thorough findings and Mr. Judy's answers, we find no error.

In her fifth assignment of error, petitioner argues that the circuit court erred in prohibiting a defense witness, investigator Glen Cook, from testifying about the sufficiency of the Inspector General's investigation regarding petitioner. At trial, Mr. Cook testified to his experience as a

private investigator, and to his thirty-one years in law enforcement as an investigator. Thereafter, the court excluded Mr. Cook from testifying about the sufficiency of the Inspector General's investigation. Petitioner claims that, as a result, she could not show the investigation's deficiencies. Petitioner argues that, even if Mr. Cook's background did not qualify him to give a formal expert opinion, the trial court should have allowed Mr. Cook to testify as to (1) what he would have done differently if he had conducted the investigation; (2) whether witness statements were obtained in a manner consistent with his law enforcement training; and (3) what the data on the computer showed in the forensic investigation.

The record on appeal shows that the Inspector General's investigator fully testified regarding her investigation. The sufficiency of that investigation was a question for the jury. We have held that "'[t]he jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses.' Syl. Pt. 2, *State v. Bailey*, 151 W.Va. 796, 155 S.E.2d 850 (1967)." Syl. Pt. 8, *State v. McGilton*, 229 W. Va. 554, 729 S.E.2d 876 (2012) (citing Syl. Pt. 2, *State v. Martin*, 224 W. Va. 577, 687 S.E.2d 360 (2009)). Thus, the court did not err in precluding Mr. Cook from opining about any alleged "deficiencies" in the investigation or what he would have done differently.

In her sixth and final assignment of error, petitioner argues that her sentence violates the proportionality rule in Article III, Section 5 of the West Virginia Constitution because it is impermissibly and shockingly harsh and disproportionate to the facts in this case. Petitioner notes that she is sixty years old, has no prior convictions, and paid restitution in full. She also claims that she was singled out for prosecution because she investigated and uncovered the Guild's fraud. Thus, petitioner argues that the sentence is shocking and disproportionate to the offense, and based on impermissible factors, i.e., that she rejected a plea agreement and pursued a jury trial. Petitioner highlights that, under the plea offer, petitioner could have filed a Rule 35(b) motion for reduction of sentence with no opposition from the State and could have been released on probation after serving only eight months in jail. She further claims that this wide gap between the proposed sentence and the actual sentence shows that factors other than petitioner's offenses influenced the court.

> There are two tests to determine whether a sentence is so disproportionate to a crime that it violates our constitution. *Accord, Stockton v. Leeke*, 269 S.C. 459, 237 S.E.2d 896, 897 (1977). The first is subjective and asks whether the sentence for the particular crime shocks the conscience of the court and society. If a sentence is so offensive that it cannot pass a societal and judicial sense of justice, the inquiry need not proceed further. When it cannot be said that a sentence shocks the conscience, a disproportionality challenge is guided by the objective test we spelled out in Syllabus Point 5 of *Wanstreet v. Bordenkircher*, 166 W.Va. 523, 276 S.E.2d 205 (1981):

>> In determining whether a given sentence violates the proportionality principle found in Article III, Section 5 of the West Virginia Constitution, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other

9

> jurisdictions, and a comparison with other offenses within the same jurisdiction.

*State v. Cooper*, 172 W. Va. 266, 272, 304 S.E.2d 851, 857 (1983).

The jury found petitioner guilty of twenty-two felony counts, yet she will be eligible for parole after serving only eight years in prison. Clearly, such a sentence is not impermissible, shockingly harsh, or disproportionate. As for the amount of money petitioner unlawfully obtained, $22,400, it is of no matter. The "uttering" statute says nothing about a dollar amount. Further, the "obtaining money" by "false pretenses" statute, West Virginia Code § 61-3-24(a)(3), mandates that the dollar amount need be only $1,000 or more, which was satisfied in petitioner's case. As for petitioner's age, there is nothing in the relevant law regarding a defendant's age at sentencing. Further, petitioner presents no evidence that the State prosecuted her because she investigated and uncovered Medicaid fraud by the Guild. Instead, the State prosecuted petitioner because she used her position at the Guild to illegally divert money into her credit card accounts. As for petitioner's claim that her sentence is disproportionate because the court relied on impermissible factors in sentencing her, i.e., her rejection of the State's plea offer and the "bad acts" evidence admitted by the State against her, petitioner enters no evidence in support. Thus, we reject this assignment of error.

For the foregoing reasons, we affirm the June 11, 2019, order of the Circuit Court of Grant County.

Affirmed.

**ISSUED:** December 16, 2020

**CONCURRED IN BY:**
Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice Evan H. Jenkins

**DISSENTING:**
Justice Margaret L. Workman
Justice John A. Hutchison

Justices Workman and Hutchison would set for oral argument in accordance with Rule 19 of the West Virginia Rule of Appellate Procedure.

Hutchison, J., dissenting:

I dissent to the majority's resolution of this case. I would have set this case for oral argument to thoroughly address the error alleged in this appeal. Having reviewed the parties' briefs and the issues raised therein, I believe a formal opinion of this Court was warranted—not a memorandum decision. Accordingly, I respectfully dissent.